UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

GIOVANNI ISAI RAMIREZ REYES,

     Defendant.

Case No. 6:24-cr-231-RBD-RMN

# MOTION FOR JUDGMENT OF ACQUITTAL

Charles L. Pritchard, Jr.
Federal Defender, MDFL

*/s/Vitaliy Kats, Esq.*
Vitaliy Kats, Esq. (FBN 118748)
Assistant Federal Defender
201 South Orange Avenue, #300
Orlando, FL 32801
Telephone: 407-648-6338
vitaliy_kats@fd.org

## PRELIMINARY STATEMENT[1]

Defendant Giovanni Isai Ramirez Reyes ("Mr. Ramirez") moves the Court for a judgment of acquittal. A jury found that Mr. Ramirez violated 18 U.S.C § 844(i) when he threw two lit flares during a soccer match at Inter&Co Stadium in Orlando, Florida. Dkt. 150. The extent of the damage to Inter&Co Stadium was a couple of five-inch scuffmarks on the concrete floor of the Supporters' Terrace and some black residue that has long since disappeared. The flares also caused a small, superficial burn to a five-year-old girl's ("E.Z.") wrist that faded after a few days and required no medical intervention. Mr. Ramirez now faces a mandatory minimum of seven years and a maximum of forty years in prison. 18 U.S.C § 844(i).

Mr. Ramirez is entitled to a judgment of acquittal because the government failed to prove three key elements: (1) intent, (2) causation, and (3) damages. Even if the jury convicted Mr. Ramirez on an attempt theory, the government failed to prove intent or a substantial act in furtherance of arson. Accordingly, the Court should enter a judgment of acquittal in favor of Mr. Ramirez.

## BACKGROUND

Mr. Ramirez is a fan of the Orlando City soccer club. 2 Tr. 48:6–9. On February 24, 2024, he attended an Orlando City home game at Inter&Co Stadium ("Stadium")—a 25,046-seat sports venue with an area that covers several hundred thousand square feet. 1 Tr. 55:24–56:3; 2 Tr. 99:25–100:2.

---

[1] The transcript of Mr. Ramirez's trial, will be cited as "_ Tr. _:_." The relevant transcripts appear at Dkt. 166–69 and are attached as **Exhibits A–D.**

Toward the end of the match, Mr. Ramirez threw two lit flares in section 23 of the Supporters' Terrace, a special section of the Stadium for Orlando City's rowdiest fans and supporter groups.3 Tr. 219:22–25. Though not permitted in the Stadium, flares are a soccer tradition. Multiple government witnesses, including employees of the Stadium and Major League Soccer, testified that they had seen soccer fans light flares (and throw them) at either the Stadium or other soccer venues around the world. 1 Tr. 37:15–25; 2 Tr. 23:9–26:5; 2 Tr. 240:21–241:9. Orlando City's director of facility operations even described how flares could make the game experience "cool." 2 Tr. 241: 21–25.

The flares went out after sixty seconds, as they were designed to do. 2 Tr. 15:9–25; 3 Tr. 34:23–38:14. The incident had no real impact. Nobody called the fire department, the fans did not evacuate, the game did not stop, the Stadium did not close, and no subsequent games were cancelled. 2 Tr. 29:16–25.

The only adverse effect from the flares was that E.Z. apparently sustained a small burn to her wrist, which both E.Z.'s mother and a paramedic described as "superficial." 2 Tr. 171:10–173:1; 2 Tr. 198:14–199:10. E.Z.'s mother declined any ambulance transport or vital sign measurement for her daughter on the night of the flare incident. 2 Tr. 199:22–200:9. After four days, the burn went away without the need for any medical intervention. 2 Tr. 171:10–173:1.

On March 8, 2024—thirteen days after the flare incident—the Stadium's director of security, Jason Klauber, met with officers from the Orlando Police Department ("OPD"). He initially told the officers that the flare incident resulted

2

in no damage to the Stadium and had just been a "reckless thing." 2 Tr. 21:3–6. But that same day, Mr. Klauber apparently discovered five-inch scuffmarks and spots of black residue near the area where the flares had landed in the Supporters' Terrace. 2 Tr. 27:10–14. By the time these scuffs and stains were discovered, two more games had taken place in the Stadium. 2 Tr. 18:10–20:6. OPD originally treated the incident as a battery and criminal mischief matter, but ATF turned it into a federal arson investigation. When ATF first inspected the scuffs on April 9, 2024, the black residue had nearly faded. When Mr. Ramirez's counsel and expert witnesses inspected the Stadium on May 6, 2023, the residue was gone.

Based on this conduct, Mr. Ramirez was charged under the federal arson statute, 18 U.S.C. § 844(i), with one count of "maliciously damag[ing], by means of a fire, a building and property used in an activity affecting interstate and foreign commerce," which "resulted in personal injury to victim E.Z." Dkt. 1. The charge carries a mandatory minimum prison term of seven years and a maximum term of forty years. After a jury trial, Mr. Ramirez was found guilty. Dkt. 150.

A.    *Evidence Concerning Intent*

After Mr. Ramirez was identified through facial recognition software, law enforcement officers from ATF and the Orlando Fire Department met with him on April 29, 2024. A transcribed recording of their conversation with Mr. Ramirez was admitted into evidence as **Government's Exhibit 13B**. The recording demonstrates that, within minutes of meeting with law enforcement, Mr. Ramirez

3

admitted to throwing the flares but clarified that he was not trying to target anyone, and that his actions were "a soccer tradition." 2 Tr. 122:17–124:1.

Mr. Ramirez's statement concerning the traditional use of flares at soccer games was confirmed by numerous government witnesses, including: (1) Scott Sturrup (1 Tr. 37:15–25); (2) Jason Klauber (2 Tr. 23:9–26:5); and (3) Julie Baca (2 Tr. 240:21–241:9). Mr. Sturrup, who had been a consultant with Major League Soccer and football associations in Europe, testified that he had attended games where flares "***have been thrown down towards the pitch***." 1 Tr. 21:18–23 (emphasis added). Julie Baca described an incident during COVID-19 when fans dropped lit flares in the middle of the road outside of the Stadium and said "that's what made the experience cool. It makes for a great photo." 2 Tr. 241: 21–25.

Steven Ingram, a longtime fan of Orlando City, also testified that he had used flares to express his support:

> Well, it's not just myself or even other Orlando City fans. You know, soccer is the most popular sport in the world. If you look at how other supporters across the world in several different countries, flares are a part of supporter culture. It's not just something that's localized to a few Orlando City fans. I mean, that's the worldwide aspect of it.

3 Tr. 223:16–22. Mr. Ingram also testified that although bringing flares into the Stadium was against the rules, the team did not necessarily discourage it:

> Yes. It's against the rules. But there are many things that are against the rules at [the] Stadium that are tolerated by the staff.
>
> ***
>
> The match that I mentioned against the Red Bulls, there were flares lit in the supporters section directly behind the goal, and I don't recall

4

anybody getting kicked out of the game for that. And I was right there where the flares were being lit off.

\*\*\*

[F]or a while there, there was a Heineken commercial. And it wasn't explicitly stated that it was in Orlando stadium; however, the colors on the stadium in the commercial were purple and gold. That's Orlando City Soccer Club's colors. And in this Heineken commercial, there were several scenes, CGI animated scenes of flares being lit off in the crowd.

So that combined with nobody getting kicked out as far as my knowledge, I would say that it's something that neither the team nor the stadium itself has really approached us about.

3 Tr. 225:2–4, 226:10–14, 226:18–227:4.

The model of flare used in the incident also speaks to Mr. Ramirez's lack of intent. The flare was designed to extinguish after 60 seconds, and it did so according to both video evidence of the incident, testimony from the government's fire inspector (Elizabeth Goddard), and a field test performed by ATF using a similar type of flare. 2 Tr. 15:9–25; 3 Tr. 34:23–38:14. The government never offered any evidence or explanation as to why a so-called "arsonist" who intended to damage the Stadium would use a tool designed to go out quickly. 4 Tr. 51:6–18.

Finally, the social media evidence used to identify Mr. Ramirez dispelled any semblance of motive. Mr. Ramirez had no quarrel with the Stadium or the Orlando City soccer club. On the contrary, he loved the team:

4 likes
rad_dad24 Saturday was a tough defeat but I'm proud to be city fan.

**Gov. Ex. 25B.**

5

### B.        *Evidence Concerning Causation*

The timeline of events after the flare incident raised serious doubt as to whether the flares Mr. Ramirez threw caused any damage to the Stadium. The flare incident took place on ***February 24, 2024***. Nobody observed any deterioration to the Stadium until, at the earliest, ***March 8, 2024***. 3 Tr. 183:15–19. The earliest photographs of the deterioration are from ***March 13, 2024***. 2 Tr. 22:12–15. During this interim period, three home games took place at the Stadium, 2 Tr. 18:10–20:5, 23:3–8, and at least one other flare incident occurred. 2 Tr. 24:2–4.

Mr. Ramirez presented evidence of multiple alternative causes for the deterioration the Stadium that could have resulted in the scuffs and stains in the Supporters' Section. Any one of these alternative causes was just as likely to have resulted in the alleged deterioration as the flares.

As a matter of policy, the Stadium is pressure-washed after every single game. 2 Tr. 249:4–8. In fact, law enforcement observed pressure washers in the Supporters' Terrace when they visited the Stadium on two separate occasions. 2 Tr. 102:13–104:12. Dr. Marc Zupan testified that pressure washing can lead to deterioration and spalling in concrete like the type observed in the Supporters' Terrace. 3 Tr. 169:12–17. The government's expert conceded that she did not "know enough about pressure washing" to determine whether it could have caused the scuff marks in the concrete. 3 Tr. 33:15–24. Indeed, she admitted that she was only looking for heat-related sources when inspecting the Stadium because that is her only role as a fire inspector. 3 Tr. 34:5–13. Julie Baca, the Stadium's director

6

of facilities, admitted on redirect examination that pressure washing has caused damage to the Stadium's concrete in the past. 2 Tr. 251:3–13. She also tried to distinguish pressure-washing damage from the charged deterioration in this case, claiming that it typically happened around "existing cracks." *Id.* But the government presented no evidence of what the charged areas looked like before February 24, 2024, so there is no way of knowing for sure whether "existing cracks" were present. As John Handel's inspection of the Stadium made clear, there are "existing cracks" all over the Supporters' Terrace. **Def. Ex. 35A.**

Mr. Ramirez presented evidence that fans in the Supporters' Terrace often engage in rowdy activities, such as kicking the folded-down aluminum bleachers rhythmically while they chant. 3 Tr. 166:25–167:6, 188:4–6, 221:12–16. Even the government's star witness, Kayla Abbott (E.Z.'s mother), testified that the bleachers in the Stadium are "for kicking." 2 Tr. 164:7–165:6. Dr. Zupan testified that a fan kicking the bleachers could leave black residue behind if he wore a black-soled shoe. 3 Tr. 188:6–7. There also happened to be black residue all over the bleachers in other parts of the Stadium. 2 Tr. 105:12–107:16. Another equally likely source of residence was the purple smoke cannisters that are allowed in the Stadium. Multiple witnesses from both sides testified that smoke from these purple cannisters travels up from the capo stands at the bottom of the Supporters' Terrace and into the upper rows. 1 Tr. 8:23–9:4, 3 Tr. 222:4–7. The smoke logically could have caused black residue in the charged areas. 3 Tr. 217:9–19.

Besides the black residue, there was also visible evidence of other scuffing all over the Supporters' Terrace. Mr. Ramirez's engineering expert, John Handel, created a non-exhaustive 3D map indicating other areas of concrete deterioration and patching that he observed while inspecting the Supporters' Terrace. The map makes clear that deterioration is ubiquitous all over the concrete slab:



**Def. Ex. 35A.**

One area of scuffing in the Supporters Terrace was essentially indistinguishable from the areas alleged by the government to have been caused by flares:





**Joint Ex. 24, Joint Ex. 28, and Def. Ex. 18.**

8

Given the similarity of these areas, it is just as likely that a different flare incident may have caused the charged deterioration after February 24, 2024. After all, government witnesses testified to multiple other flare incidents in and around the Stadium. 2 Tr. 23:3–24:4, 25:16–26:7, 241: 21–25. Scott Sturrup even found a similar-looking flare apparently recovered from a different incident that looked like the one Mr. Ramirez threw. 1 Tr. 48:2–14.

Finally, Florida's natural environment could have caused the charged deterioration. As Dr. Zupan testified:

> [T]he weather in Orlando is particularly aggressive to concrete because of these rain cycles that are routine and the high humidity. That does not allow the concrete to necessarily dry out.
>
> And then when you do have moisture on the concrete or moisture in the concrete, it's inside the concrete. It's breaking down the paste itself, for lack of better words. And so you have this environment that is rich for degradation of the concrete.

3 Tr. 154:15–23. Even the government's expert conceded that environmental concrete spalling "probably" happens in Florida. 3 Tr. 27:15–18.

With the evidence of alternative causes in mind (fans, environment, and pressure washing), the timeline of events in this case is as follows:

| **Date** | **Occurrence** |
|---|---|
| February 24, 2024 | Flare incident. Flares lost immediately afterwards. **Nobody reports damage.** |
| February 27, 2024 | First intervening home game against Cavalry FC. **Opportunity for alternative causes** (fan activity, pressure washing, environment) |

| March 5, 2024 | Second intervening home game against Tigres. **Opportunity for alternative causes** (fan activity, pressure washing, environment) |
| March 8, 2024 | Earliest discovery of deterioration |
| March 9, 2024 | Third intervening home game against Minnesota. **Opportunity for alternative causes** (fan activity, pressure washing, environment) |
| March 13, 2024 | Earliest photos of alleged deterioration, **3 games and 18 days later.** |

### C.    *Evidence Concerning Damage*

In its ruling on Mr. Ramirez's second pretrial motion, the Court defined the verb "damages" in Section 844(i) as follows: to cause harm that results in "a loss in value, usefulness, or ability." Dkt. 86 at 4–5. The government presented no evidence whatsoever to satisfy this definition, which is consistent with the bulk of "useful and authoritative dictionaries." *Id.* at 4. The sole piece of evidence offered by the government was a quote for repairing the concrete, but that quote was excluded for violating the Confrontation Clause. 2 Tr. 219:20–234:12. After the quote was excluded, the government tried to elicit additional evidence from John Handel on cross examination about how much it would cost to repair the scuffs in the concrete (the stains had long since disappeared). In a stranger-than-fiction exchange, the government made Mr. Handel describe in detail how he would go to Home Depot and buy a ten-dollar trowel to repair the scuffs. 2 Tr. 124:2–125:11. In a still-stranger exchange, the government made Mr. Handel speculate on how to restore five-inch scuffs to mint condition regardless of economic feasibility—a

10

process that would involve jackhammering the concrete and "wouldn't really make much sense." 3 Tr. 129:19–130:10. During closing, the government presented a desperation argument: Mr. Ramirez's flares resulted in loss of usefulness because fans "had to clear out" ***for 60 seconds*** until the flares extinguished. So in other words, because fans had to scoot over for one minute, the 25,000-seat Stadium lost usefulness and Mr. Ramirez committed arson. This was the entirety of the government's evidence concerning damage. There was no evidence that attendance or ticket sales declined, that the Stadium lost any market value, or that the deterioration to the Supporters' Terrace rendered it unsafe.

## LEGAL STANDARD

Under Rule 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." When considering a Rule 29 motion for acquittal, the Court must "view all the evidence in the light most favorable to the government." *United States v. Sellers*, 871 F.2d 1019, 1020 (11th Cir. 1989) (citation omitted).

The standard for acquittal is challenging, but it is "not wholly insurmountable" because "the government bears the burden of proof" at trial. *United States v. Vorley*, 2021 WL 1057903, at *3 (N.D. Ill. Mar. 18, 2021). Accordingly, "the height of the [defendant's] hurdle depends directly on the strength of the government's evidence." *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). "[G]ut feelings and suspicions do not relieve the government of the

11

burden of offering sufficient evidence to prove guilty beyond a reasonable doubt." *United States v. Garcia*, 919 F.3d 489, 499 (7th Cir. 2019). "Unbridled speculation is an impermissible basis for conviction beyond a reasonable doubt." *United States v. Hickman*, 626 F.3d 756, 769 (4th Cir. 2010). The government must do more than present evidence "at least as consistent with innocence as with guilt." *United States v. Mankani*, 738 F.2d 538, 547 (2d Cir. 1984).

## ARGUMENT

### I.    The Government Did Not Prove Intent.

Under Section 844(i), the government must show that Mr. Ramirez "maliciously" damaged a building used in interstate commerce by means of fire. "When used in defining a crime, a word like 'malice' or 'malicious' has long described a state of mind requiring intentionality or a 'willful disregard of [a] likelihood' of harm.'" *United States v. Lung'aho*, 72 F.4th 845, 848 (8th Cir. 2023) (citation omitted). "Malice is close to recklessness, except for one subtle difference. A reckless act involves 'consciously disregard[ing] a substantial and unjustified risk,' but unlike a malicious one, the 'risk need not come anywhere close to a likelihood.'" *Id.* at 849 (quoting *Borden v. United States*, 593 U.S. 420, 427 (2021)). "To put it in simpler terms, an action that has a 3% chance of harming someone, ***like shooting a gun straight up in the air in a crowded park***, might be reckless . . . but such a low probability of harm would fail to satisfy the 'very high degree of risk' required by malice." *Id.* (emphasis added).

12

While the government proved that Mr. Ramirez threw the flares, it failed to present any evidence that he did so "maliciously." Mr. Ramirez threw the flare only because he believed that he was participating in a harmless, perhaps slightly mischievous, soccer tradition. That is precisely what he told law enforcement officers within five minutes of meeting them: he did not mean to hurt anyone, and the flares were "a soccer tradition." 2 Tr. 122:17–124:1. Multiple government witnesses unwittingly backed up what he said by testifying to multiple other flare incidents in Orlando and elsewhere. 1 Tr. 37:15–25; 2 Tr. 23:9–26:5; 2 Tr. 240:21–241:9. The Stadium's director of facilities said flares could make the game experience "cool." 2 Tr. 241: 21–25. Mr. Sturrup, an MLS consultant who had travelled to Europe, testified that he had attended games where flares "***have been thrown down towards the pitch***." 1 Tr. 21:18–23. Mr. Ingram, a superfan of Orlando City, testified that even though flares technically were against the Stadium's rules, they were tolerated by Stadium staff and even used in marketing promotion by Orlando City. 3 Tr. 225:2–4, 226:10–14, 226:18–227:4.

Unlike most prosecutions, the government failed to present any evidence of motive whatsoever. *United States v. Slough*, 22 F. Supp. 3d 16, 22 n.4 (D.D.C. 2014) (describing "motive" and "intent" as "closely linked"). Normally, motive is easy to come by in a federal case—a drug dealer sells fentanyl for profit, a pedophile exploits children for lust, and so on. But here, the government presented no motive whatsoever for any purported malice by Mr. Ramirez. On the contrary, the social media evidence used by the government to identify Mr. Ramirez showed that he

13

loved Orlando City and was proud to be a fan of the team even when it endured tough losses at home. **Gov. Ex. 25B.**

The flares themselves also cut against intent. It is undisputed that the model of flare thrown by Mr. Ramirez was designed to extinguish after 60 seconds. That is precisely what happened according to video evidence of the incident, testimony from ATF agent Elizabeth Goddard, and a field test performed using a similar type of flare. 2 Tr. 15:9–25; 3 Tr. 34:23–38:14. Someone who maliciously intends to damage a Stadium by means of fire would not use a tool that extinguishes within one minute. 4 Tr. 51:6–18. The mere fact that Mr. Ramirez used a flare designed to go out so quickly militates against a finding of intent.

While Mr. Ramirez did not shoot any kind of gun at anything, his actions are most comparable to the example discussed in *Lung'aho*, where the Eighth Circuit explained that "shooting a gun straight up in the air in a crowded park" was only enough to prove recklessness, not malice. *Lung'aho*, 72 F.4th at 848. Perhaps Mr. Ramirez's decision to throw the flares was reckless, but the likelihood of the action causing damage to the Stadium was not high enough to impute malice.

The government's theory of intent focused entirely on Mr. Ramirez's movements throughout the Stadium. Because Mr. Ramirez walked near the area where the flares landed, and because he left the Stadium after throwing them, the government believes he was acting maliciously. 4. Tr. 16:22–17:4. But none of these actions satisfy the malice standard. All they show is that Mr. Ramirez knew throwing flares was against the Stadium's rules. 4 Tr. 52:9–18. The government

14

has made a fatal mistake by ***conflating intent to throw the flares*** (which Mr. Ramirez certainly did) ***with intent to maliciously damage the Stadium***. The government may have proven the former, but it presented absolutely no evidence on latter—not even a basic motive. And only the latter form of intent is relevant to the offense of arson under Section 844(i).

## II.    The Government Did Not Prove Causation.

The core offense within Section 844(i)—damaging property by means of fire—does not explicitly state a causation standard. That said, the enhancement for personal injury provides that the standard for causation is "direct or proximate result." 18 U.S.C. § 844(i). Mr. Ramirez assumes this is the minimum standard for causation that applies to the substantive offense too. The phrase "direct or proximate result" combines actual cause and legal cause. *See United States v. Pritchard*, 964 F.3d 513, 519 (6th Cir. 2020). Thus, the government must show either that the damage to property was a reasonably foreseeable result of the arson, or that it was the actual cause (*i.e.,* the but-for cause). *Id.*

Here, the government proved neither proximate causation nor actual causation with respect to the scuffs and stains in the Stadium. The deterioration could just as likely have been caused by other fans from other games, pressure washing, or environmental factors.

Eighteen days passed between the date of the flare incident and the date when the first pictures of the deterioration were taken. During this interim period, three home games took place at the Stadium, 2 Tr. 18:10−20:5, 23:3−8, and at least

15

one other flare incident occurred. 2 Tr. 24:2–4. The government's own witnesses acknowledged that the Stadium is pressure-washed after every single game, and Dr. Zupan confirmed that pressure washing can lead to deterioration and spalling in concrete like the type observed in the Supporters' Terrace. 3 Tr. 169:12–17. The government's expert admitted that she did not "know enough" about pressure washing to consider it, even though law enforcement officers observed pressure washers in the Stadium multiple times. 2 Tr. 102:13–104:12; 3 Tr. 33:15–24. Julie Baca even admitted that pressure washing has caused damage to the Stadium's concrete in the past. 2 Tr. 251:3–13.

Fan activity is another, equally likely cause of the deterioration. Mr. Ramirez presented video evidence of fans kicking the aluminum bleachers in the Stadium. 3 Tr. 166:25–167:6, 188:4–6, 221:12–16. A fan kicking the bleachers could leave black residue behind if he wore a black-soled shoe. 3 Tr. 188:6–7. Alternatively, the purple smoke cannisters that are allowed in the Supporters' Terrace could have traveled from the capo stands at the bottom of the Supporters' Terrace and into the upper rows, ultimately settling as black residue in the charged areas. 1 Tr. 8:23–9:4; 3 Tr. 222:4–7, 217:9–19. Another flare incident also could have been a culprit—multiple other flare incidents were documented and described by the government's witnesses. 2 Tr. 23:3–24:4, 25:16–26:7, 241: 21–25. Scott Sturrup apparently even found another flare from a different incident while searching for Mr. Ramirez's flare. 1 Tr. 48:2–14.

16

Lastly, Florida's natural environment could have caused the charged deterioration, based on both Dr. Zupan's and Elizabeth Goddard's testimony concerning Florida's climate. 3 Tr. 27:15–18; 3 Tr. 154:15–23. It does not take an expert to know that Florida's climate "is particularly aggressive to concrete" due to "high humidity," which causes spalling on various concrete surfaces like driveways. 3 Tr. 154:15–23. Given all of these alternative causes, particularly when juxtaposed with the long gap between the flare-throwing incident and the discovery of the deterioration, the government did not prove causation beyond a reasonable doubt.

## III.   The Government Did Not Prove Damages.

The Court correctly defined "damages" in Section 844(i) according to its plain-language, dictionary definition: to cause harm that results in "a loss in value, usefulness, or ability." Dkt. 86 at 4–5. Under this authoritative definition, the government has not carried its burden. The government presented no proof whatsoever that the Stadium—which is the unit of property charged in the Indictment—lost any value, usefulness, or ability. The sole piece of evidence offered by the government for this purpose was excluded under the Confrontation Clause. 2 Tr. 219:20–234:12. The government's remaining arguments concerning damage were facially absurd. The government claimed that paying ten dollars for a trowel at Home Depot was sufficient to convict Mr. Ramirez, or that the Stadium somehow needed to jackhammer the concrete surface and repour a larger area of the concrete slab. 2 Tr. 124:2–125:11, 3 Tr. 129:19–130:10. There was no evidence

17

that attendance or ticket sales declined, that the Stadium lost any market value, or that the deterioration to the Supporters' Terrace rendered it unsafe.

If the government prevailed on damages at all, it was only because the Court permitted the government to argue around the dictionary definition of "damage." At numerous points during its closing, the government argued that it did not need to prove loss of value, usefulness, or ability. 4. Tr. 11:10–20 63:7–11, 63:23–24. The government was permitted to do this because the Court held that jurors could decide for themselves on an appropriate definition of "damages" and disregard the dictionary definition if they so desired. As discussed in Mr. Ramirez's separate motion for new trial, this was a mistake of law. But even if the jury did apply the correct definition of damages, the government did not satisfy that definition. Accordingly, the government failed to prove damages beyond a reasonable doubt.

## IV.    The Government Did Not Prove Attempted Arson.

The government argued at trial that even if Mr. Ramirez did not complete the crime of arson, he nevertheless is guilty of attempted arson as a lesser-included offense. This does not save the government from acquittal.

Attempted arson has a higher level of intent than completed arson. To prove attempted arson, the government would need to show that Mr. Ramirez "knowingly intended to commit the crime of arson." Dkt. 147 at 7; *see also United States v. Cooper*, 926 F.3d 718, 735 (11th Cir. 2019). In other words, willful disregard is no longer an option—the government must prove knowing intent. For the reasons above, the government did not even satisfy the malicious standard of

18

intent, let alone the higher standard for attempted arson. Mr. Ramirez threw the flare only because he believed that he was participating in a harmless, perhaps slightly mischievous soccer tradition. 2 Tr. 122:17–124:1. Multiple government witnesses unwittingly confirmed this. 1 Tr. 37:15–25; 2 Tr. 23:9–26:5; 2 Tr. 240:21–241:9. The fact that the flares used by Mr. Ramirez went out after sixty seconds also confirmed this. 2 Tr. 15:9–25; 3 Tr. 34:23–38:14.

Attempted arson also requires a "substantial step" toward committing the offense. A "substantial step means "some important action leading to the commission of a crime as distinguished from some inconsequential or unimportant act." *United States v. Rothenberg*, 610 F.3d 621, 627 n.8 (11th Cir. 2010). "It must be something beyond mere preparation; it must be an act which, unless frustrated by some condition or event, would have resulted, in the ordinary and likely course of things, in the commission of the crime being attempted." *Id.* Under the facts of this case, throwing the flares was not an act which would have resulted in damage to the Stadium in the ordinary course of things. Once again, the flares were designed to go out after sixty seconds, which they did. 2 Tr. 15:9–25; 3 Tr. 34:23–38:14. As Dr. Zupan testified, [t]he spalling [charged by the government] . . . is inconsistent with that amount of burn time." 3 Tr. 208:3–4. This testimony was based on his examination of the relevant literature:

> When you look at the -- when you look at heat or fire testing of concrete, say, specifically, the American Concrete Institute and other journal papers, they talk about thermal loading in the concrete on the orders of 15, 20, 30 minutes, not 1 minute. So the idea is, you load the

> concrete thermally for 15 minutes before you would expect to start to see any kind of damage. . . . It's not enough time.

3 Tr. 190:15–24. Candidly, one does not need an expert to conclude that sixty seconds is not enough time to "damage" a 25,000-seat sports venue considering that the venue *as a whole* must lose value or usefulness. Accordingly, the government failed to prove that Mr. Ramirez's act of throwing the flares was a substantial step toward committing arson, *i.e.*, toward "damaging" the Stadium.

## CONCLUSION

Mr. Ramirez is entitled to a judgment of acquittal because the government failed to prove: (1) intent, (2) causation, and (3) damages. Even if the jury convicted Mr. Ramirez on an attempt theory, the government failed to prove intent or a substantial act in furtherance of arson. Accordingly, the Court should enter a judgment of acquittal in favor of Mr. Ramirez.

(*Attorney Signature on Following Page*)

20

Dated: January 5, 2026

Respectfully submitted,

Charles L. Pritchard, Jr.
Federal Defender, MDFL

*/s/Vitaliy Kats, Esq.*
Vitaliy Kats, Esq. (FBN 118748)
Assistant Federal Defender
201 South Orange Avenue, #300
Orlando, FL 32801
Telephone: 407-648-6338
vitaliy_kats@fd.org

## CERTIFICATE OF CONFERRAL

Mr. Ramirez's counsel certifies that: (1) they conferred with government's counsel in a good faith effort to resolve this motion; (2) the government opposes the motion; and (3) the motion is not covered by the Court's scheduling order.

*/s/Vitaliy Kats, Esq.*
Vitaliy Kats, Esq.

## CERTIFICATE OF SERVICE

I certify that on January 5, 2026, I filed the foregoing with the Clerk by using the CM/ECF system, which will send a notice of filing to counsel of record.

*/s/Vitaliy Kats, Esq.*
Vitaliy Kats, Esq.

21