UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO. 6:24-cr-231-RBD-RMN

GIOVANNI ISAI RAMIREZ REYES

**UNITED STATES' RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR JUDGMENT OF
ACQUITTAL UNDER FED. R. CRIM. P. 29(c)**

The United States opposes the Defendant's motion for judgment of acquittal

under Fed. R. Crim P. 29(c) (Doc. 172). The Court should deny the motion because

the evidence presented at trial, considered in the light most favorable to the

government, together with all reasonable inferences, was more than sufficient to

support a reasonably-minded jury's verdict of guilt beyond a reasonable doubt.

**BACKGROUND**

On the evening of February 24, 2024, Inter & Co Stadium in Orlando,

Florida, hosted a Major League Soccer (MLS) match between Orlando City and CF

Montréal (JE13; 1 Tr. 18:29-25).[1] The Defendant entered the stadium before the

game and proceeded to the Iron Lion Firm (ILF) supporter section located at the

northeast end of the stadium (Government Exhibit ("GE") 3a-3c, 4; 1 Tr. 17:18-25,

18:1-18). He socialized with fans in that area for a period of time before he walked

---

[1] For the ease of the reader, the United States cites to the trial transcripts in the same
format used by the Defendant in his motion.

toward the northwest end of the stadium, where the other supporter group, Ruckus, was located, and began scouting it (Government Exhibit ("GE") 4, 3e; 1 Tr. 18:11-18, 79:2-4).

Around 9:00pm, in the middle of the match, the Defendant emerged from a vomitory in the Ruckus supporter section, pulled two metal, marine flares out of his jacket, ignited them, and threw them into the rows of fans below him (GE 4; Joint Exhibit "JE" 1; 1 Tr. 59:11-13, 66:11-12, 75:24-25).



(GE 1). One of the flares struck a four-year-old child, E.Z., igniting the fabric of the fleece jacket she was wearing and burning several holes through it (GE 4, 9a-9l, 10;

JE 1; 2 Tr. 142:21-22, 156:5-10, 210:22-24). E.Z. immediately complained that her arm hurt (2 Tr. 211:25,212:1-8). Her mother, seeing the holes melting through the jacket removed the jacket and observed redness on E.Z.'s skin (2 Tr. 156:22-25, 159:17-20). E.Z. was seen by a stadium paramedic, who described E.Z. as inconsolably crying and who observed a superficial red mark on the child's arm (2 Tr. 192:18-25,193:1). The paramedic provided an ice pack and recommended that the mother apply burn cream to E.Z.'s arm (2 Tr. 156:18-21, 194:17). E.Z.'s mother proceeded to apply aloe lotion to her arm when they returned home from the game and for the next several days because E.Z. continued to complain that her hand was burning 2 Tr. 157:4-5, 14-20). E.Z. did not return to another soccer game for approximately a year and a half because E.Z. was too scared (2 Tr. 158:15-23).

The burning flares ended up on the stadium floor, where they continued to burn for approximately sixty seconds (GE 4; JE 1). The fans who had been in those rows cleared out to the stadium steps/walkways (*Id.*; 1 Tr. 26:4-11). One of the fans testified that they moved away from the flares "so we didn't get burned" (2 Tr. 209:1-2).The temperature of the flares was hot enough that they burned divots into the concrete flooring of the two rows in which they landed (GE 6a-6c, 16, 17; JE 14-19; 3 Tr. 13:22-25, 14:2-9). They also discolored the adjacent aluminum benches (*Id.*).

3



Sent from my iPhone

(GE 6b and 6c).

Immediately after throwing the flares, the Defendant turned and ran (GE 4, JE 1). Rather than exit the stadium, however, the Defendant proceeded through the concourse to an adjacent section of the stadium, where he changed his appearance by removing his hat and jacket (*Id.*; 1 Tr. 86:22-25, 87:1-2). He then descended stairs bringing him closer to the area of the fires, where he was better able to observe what he had done (*Id.*). He then exited into the lower concourse, putting his hat and jacket back on before exiting the stadium.

As the Defendant was walking toward the exit, he was passed by stadium security personnel who were running to respond to the fires (GE 3d; 1 Tr. 81:13-22). The Director of Stadium Safety and Security reached one of the burning flares and

made several efforts to put it out, including dipping it in a cup of beer, pouring beer on it, and stomping on it with his shoe (GE 4; JE 1; 1 Tr: 60:2-4, 69:6-12).

The Defendant was not immediately identified or apprehended. Law enforcement officers had to obtain and review surveillance footage from the stadium and compare it to social media imagery from the internet to identify the Defendant (2 Tr. 40:6-25, 41-43). When confronted by law enforcement officers on April 29, 2024, the defendant admitted he was at the game and identified himself in stadium surveillance footage (GE 13a, 13b). Asked if he had thrown the flares, the Defendant initially denied it (*Id.*; 2 Tr. 121:4-9). Shown surveillance imagery of him throwing the flares, the Defendant then admitted he had done it (Id.; 2 Tr. 77:20-25, 78:1-23, 121:4-9). The Defendant claimed he threw the flares as part of "soccer tradition." (GE 13a, 13b).

As reflected on signage around Inter & Co. Stadium, flares are prohibited at MLS matches and within stadium (JE 2-4). Several stadium personnel testified at trial, including the Director of Safety and Security, an MLS security advisor, and Director of Facility Operations (1 Tr. 14:18-23, 53:11-12; 2 Tr. 215:7-9). A Fire Investigator with the Orlando Fire Department also testified (2 Tr. 50:1-4). None of these witnesses identified another instance in which they had seen or heard of a flare being ignited or thrown inside Inter & Co Stadium (1 Tr. 21:24-25, 22:1, 89:10-18; 2 Tr. 79:7-9, 251:25, 252:1-9). The Defendant's friend, a soccer fan affiliated with ILF, who testified he had attended over 100 matches at Inter & Co Stadium, identified

one game in 2022 when he saw a flare ignited inside the stadium (3 Tr. 219-29). He

had never seen a flare thrown inside the stadium (*Id.*).

## LEGAL STANDARD

In evaluating a motion for judgment of acquittal under Rule 29(c), the Court

must determine whether the evidence, "viewed in the light most favorable to the

Government, could be accepted by a reasonably-minded jury as adequate and

sufficient to support the conclusion of the Defendant's guilt beyond a reasonable

doubt. The same test applies whether the evidence is direct or circumstantial." *United

States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979).[2] "In applying this standard all

reasonable inferences and credibility choices must be made in favor of the jury

verdict, and that verdict must be sustained if there is substantial evidence to support

it when the facts are viewed in the light most favorable to the government." *United

States v. Pintado*, 715 F.2d 1501, 1503 (11th Cir. 1983) (internal quotations omitted).

"It is not necessary that the evidence exclude every reasonable hypothesis of

innocence or be wholly inconsistent with every conclusion except that of guilt,

provided a reasonable trier of fact could find that the evidence establishes guilt

beyond a reasonable doubt. A jury is free to choose among reasonable constructions

of the evidence." *Id*.

"When a jury finds a Defendant guilty, its verdict must stand if '*any* rational

---

[2] All decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 1206, 1209 (11th Cir.1981).

trier of fact could have found the *essential* elements of the crime beyond a reasonable doubt.'" *United States v. Brenson*, 104 F.3d 1267, 1275 (11th Cir. 1997) (emphasis in original) (quoting *United States v. Saget*, 991 F.2d 702, 711 (11th Cir.) *cert. denied*, 510 U.S. 950 (1993)); *accord United States v. Tinoco,* 304 F.3d 1088, 112 (11th Cir. 2002) ("We uphold the jury's verdict unless no trier of fact could have found guilt beyond a reasonable doubt.") (internal quotations omitted). It is not properly the function of a court, "in ruling on such a motion, to assess the credibility of witnesses, weigh the evidence, or substitute its own judgment as to the guilt or innocence for that of the jury. Once the government's evidence has passed the test of legal sufficiency, a trial judge is without authority to enter a judgment of acquittal simply because he [or she] thinks that course would be most consonant with the interests of justice." *Burns,* 597 F.2d at 941-42 (internal quotations omitted).

## ARGUMENT

I.     **There was Sufficient Evidence for a Reasonable Jury to Find the Defendant Guilty Beyond a Reasonable Doubt.**

The Defendant was charged with maliciously damaging by means of a fire Inter & Co Stadium, a building or property used in interstate and foreign commerce, in violation of 18 U.S.C. § 844(i) (Doc.1). As the Court instructed the jury, the elements of this offense are: (1) the Defendant damaged the building or other real property described in the indictment by means of a fire; (2) the Defendant acted intentionally or with deliberate disregard of the likelihood that damage or injury would result from his acts; and; and (3) the building or other real property that the

Defendant damaged was used in an activity affecting foreign or interstate commerce (Doc. 172). The Court further instructed the jury that if it found the Defendant guilty of maliciously damaging the stadium it also needed to consider whether the government had proven beyond a reasonable doubt that the conduct resulted in personal injury to E.Z (*Id.*). The United States presented more than sufficient evidence at trial for a reasonably-minded jury to find that each of the elements of the offense and the injury enhancement were proven beyond a reasonable doubt.

### A. The Defendant damaged Inter & Co Stadium by means of a fire.

The evidence included surveillance video of the Defendant igniting and throwing two marine flares into the supporter section of Inter & Co Stadium during a soccer match on the evening of February 24, 2024 (GE 4; JE 1). The flares landed in two separate rows and each burned for approximately sixty seconds, clearing out those rows of fans who wanted to avoid being burned (*Id.*; 1 Tr. 26:4-11; 2 Tr. 209:1-2). Jason Klauber, the Stadium's Director of Safety and Security, testified that he immediately responded to the site of the fires and was able to identify himself on the surveillance footage (JE 1; 1 Tr. 59, 67:9-16). Consistent with the footage, Klauber testified that he attempted to extinguish one of the flares by picking it up by the handle, dunking it in a cup of beer, putting it back on the ground, pouring beer on it, and stomping on it with his shoe (JE 1; 1 Tr. 60:2-4, 67:23-25, 68, 69:1-12).

Klauber testified that he returned to the site of the fires on March 8, 2024, and observed damage to the concrete flooring and adjacent aluminum benches (1 Tr. 88:22-25, 89:1-9; 2 Tr. 17:12-16). This was the exact location where he had

8

attempted to extinguish one of the flares and observed the other one burning (1 Tr. 88:22-25, 89:1-9). On March 13, 2024, he took photographs of the damage, which were entered into evidence (GE 6a-6c; 1 Tr. 89:19-21). The photographs depict divots in the concrete flooring of the two rows in which they landed (GE 6a-6c). They also discolored the adjacent aluminum benches (*Id.*).

Orlando Fire Department Investigator Aaron Stover, who has participated in over 100 fire investigations testified that he examined the areas of damage on April 9, 2024, and that the damage to the concrete and charring to the bench was consistent with what he has seen in past fire investigations (2 Tr. 53:7-23, 54:3-11, 57:21-25, 58:1-4). ATF Special Agent and Certified Fire Investigator Elizabeth Goddard was qualified as an expert in the field of forensic fire investigation (2 Tr. 288: 17-25,289:1-4). She reviewed all the evidence in the case and conducted a flare function test (2 Tr. 296:6-8, 302-305). She testified that the damage to the concrete was consistent with heat spalling and that the dark-colored discoloration on the concrete and aluminum bench was consistent with soot staining from a fire (2 Tr. 291:2-10, 18-25, 292:1-7, 11-21). She identified white discoloration to the aluminum bench as consistent with heat oxidization (3 Tr. 31:7-10). Based on all the evidence, Special Agent Goddard opined that the damage was caused by the two flares that were thrown by the Defendant (298:20-25, 299:1-2).

This was more than sufficient evidence for a reasonably-minded jury to conclude that the government proved the damage element beyond a reasonable doubt. Even the Defendant's own hired expert, John Handel, described the damage

as "damage" in both his testimony and in his communication to an Orlando-area contractor soliciting a quote to repair the damage (3 Tr. 112:7, 130:23-25, 131:1-3, 123:3-12, 123:23-25, 124:1). The jury could reasonably conclude that the divots in the concrete and discoloration to the concrete and aluminum bench they viewed constituted damage, regardless of whether repairs were performed or required to be performed. Even if the jury were bound by the definition of damage sought by the Defendant that included loss of value, usefulness, or ability, the evidence presented fit that bill. The jury heard uncontroverted testimony that any repair would cost some amount of labor and money (3 Tr. 124, 125:1-11). And for the sixty seconds during which the flares burned, those rows of the stadium were rendered useless (JE1; GE4; 1 Tr. 26:4-11). Either way there is damage; there is no de minimis defense.

The remaining thrust of the Defendant's Rule 29(c) argument on the damage element is that he offered alternative causes for the damage: (1) the possibility that other flares were thrown into the exact spots of damage between February 24, 2024 and March 13, 2024, and (2) Dr. Zupan's opinion that the damage was caused by some combination of weather, fan loading, and power washing (Doc. 172 at 6-9, 15-17). These arguments fail on the facts and the law. Factually, there was no evidence presented that other flares were thrown inside the stadium at any time, let alone during that three-week period, and let alone in the exact same spot of the stadium. Also less plausible was Dr. Zupan's opinion that the flares could not possibly have caused the damage, and that the damage found in the exact spots where the flares

had landed was instead due to some amorphous combination of weather, fan stomping, and power washing. Besides defying Occam's razor, the opinion proved hollow and conclusory and there were numerous bases for discrediting it, including, among other reasons, Dr. Zupan's exposed bias and internal inconsistency in his testimony (3 Tr. 143-217). Most importantly, however, even if the Defendant had presented *reasonable* hypotheses of innocence that does not provide a basis for granting a Rule 29(c) motion given the evidence of guilt the government presented. *See Pintado*, 715 F.2d at 1503.

Accordingly, more than sufficient evidence was presented at trial for a reasonable jury to determine the damage element was met.

### B. The Defendant acted intentionally or with deliberate disregard of the likelihood that damage or injury would result from his acts.

The natural and probable consequence of the Defendant igniting two metal flares and throwing them down into a crowd at a stadium was that something would get damaged and someone would get hurt. That act alone, which is captured on the videos in evidence is sufficient evidence for a reasonable factfinder to conclude beyond a reasonable doubt that the Defendant acted intentionally or with deliberate disregard of the likelihood that damage or injury would result from his acts (GE 4; JE 1).

But that's not the only evidence the government presented on the second element. The government introduced additional video footage, which showed that, upon entering the stadium, the Defendant first went to ILF supporter section and

socialized with fans there (GE 3a-3c, 3e, 4). He then left that area to scout out the Ruckus section, surveilling the exact area where he would later throw the flares (GE 3e, 4; 1 Tr. 79:2-24). The Defendant didn't throw the flares in the ILF section. That's because he knew the flares would cause damage or injury and he didn't want to do that in the section where his friends and associates were. Immediately after throwing the flares, he turned and ran because he knew what he did was wrong (GE 4; JE 1). But he didn't leave the stadium because he wanted to enjoy his handiwork; he needed to watch the flares burn (*Id.*; 1 Tr. 86:22-25, 87:1-2). So, he went to an adjacent section and descended to a spot where he had a good view of the fires (GE 4; JE 1). He was careful to remove his hat and jacket first, though, so no one who might have seen him throw the flares would recognize him (*Id.*). Even though he got closer to the flares, he made no attempt to go over to try to extinguish the fires, as one might do if it were just a terrible mistake (*Id.*). Instead, he fled the stadium as he put his hat and jacket back on (GE 4, 3d, 3f; 1 Tr. 81:3-9).

When he was eventually tracked down and confronted by law enforcement two months later, the Defendant initially denied throwing the flares because he knew it was wrong (GE 13a, 13b). It was only after he was shown photographic proof that he admitted what he had done (*Id.*; 2 Tr. 77:20-25, 78:1-23). Of course, he grasped onto Lieutenant Stover's suggestion that he wasn't trying to hurt anyone, and he offered the self-serving excuse that he was just engaging in "soccer tradition" (GE 13a, 13b; 2 Tr. 79:14-23).The defense's attempt to convince the jury of that rightfully failed because it was unsupported by the evidence. Not a single witness, including

12

the Defendant's friend and ILF associate, Steven Ingram, identified another instance in which anyone else had thrown a lit flare into Inter & Co Stadium. And none of these witnesses, including Ingram, endorsed throwing flares into crowds as an acceptable practice or a matter of soccer tradition. That is because all of them knew, as would a reasonable juror, that the natural and probable consequence of igniting a flare and throwing it into a crowd of fans at a stadium is that something would get damaged and someone would get hurt.

The defense's attempt to redefine or reframe "maliciously" is untimely and misplaced (Doc. 172 at 12). The Court properly instructed the jury using the Eleventh Circuit pattern offense instruction, which defines maliciously in the second element as acting "intentionally or with deliberate disregard of the likelihood that damage or injury would result." The Defendant did not object to this element of the instruction (3 Tr. 242:8-13), and there was no error in the Court giving it.

Beyond establishing that the Defendant acted with deliberate disregard of the likelihood that damage or injury would result from his actions, the above-described evidence also supports the conclusion that the Defendant "knowingly intended to commit the crime of arson," as set forth in the attempt instruction. Again, the evidence supports the reasonable inference that the Defendant wanted to watch fires burn in the Ruckus section Inter & Co Stadium. He took the "substantial step" of igniting and throwing the flares into the standards of that area of the stadium.

13

### C. Inter & Co Stadium was used in an activity affecting interstate or foreign commerce and the Defendant caused personal injury to E.Z.

Finally, the Defendant does not argue that the government failed to prove the third element (interstate or foreign nexus), or that the Defendant's conduct resulted in personal injury to E.Z. (Doc. 172). Nevertheless, the government will briefly set forth the evidence supporting these findings. As to the third element, the jury received evidence that incident occurred during an international soccer match between Orlando City and Montréal CF, an MLS team based in Canada (JE13; 1 Tr. 18:29-25). In addition to the Montréal CF team traveling to Inter & Co Stadium for the game, a group of their supporters from Canada traveled down as well (1 Tr. 20:10-18). Additionally, as Inter & Co Stadium's Facilities Director, Julie Baca, testified, the stadium sells a variety of products from companies in other states and nations (2 Tr. 217:12-20; *see also* JE 20 at 9).

As to the personal-injury enhancement, the jury saw video of one of the flares landing where E.Z. was standing with her family and friends and what appeared to be a spark or flame on E.Z.'s jacket (GE 4; JE 1). Elaine Saxton, who was standing nearby, testified that the flare hit E.Z., that she heard E.Z. complain that her arm hurt, and that she saw a hole singed into E.Z.'s jacket (2 Tr. 210:22-24, 211:25, 212:1-12). E.Z.'s mother, Kayla Abbott, testified that she saw holes melting into E.Z.'s jacket and that she observed redness on E.Z.'s arm (2 Tr. 156:5-10, 156:22-25, 159:17-20), which was confirmed by paramedic Brodie Shick, who gave her an ice pack and recommended burn cream (2 Tr. 156:18-21, 192:18-25, 193:1, 194:8-10,

14

194:17). Abbott testified that she applied burn salve (aloe) when she returned home after the game, and for the next 4-5 days because E.Z. continued to complain of burning (2 Tr. 157:4-5, 14-20).

An abundance of evidence was produced at trial to support a reasonably-minded jury's determination beyond a reasonable doubt that Inter & Co Stadium was used in an activity affecting interstate and/or foreign commerce and that the Defendant's conduct resulted in personal injury to E.Z.

### CONCLUSION

The evidence presented at trial, considered in the light most favorable to the government, together with all reasonable inferences, was more than sufficient for a reasonably-minded jury to have found guilt beyond a reasonable doubt. Accordingly, the Court should deny the Defendant's motion for judgment of acquittal.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By:    /s/ *Matthew J. Del Mastro*
Matthew J. Del Mastro
Special Assistant United States Attorney
USAO No. 203
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail: matthew.del.mastro@usdoj.gov

**U.S. v. Ramirez Reyes**                    **Case No. 6:24-cr-231-RBD-RMN**

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2026, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

Vitaliy Kats, Esq.
Attorney for the Defendant

/s/ *Matthew J. Del Mastro*
Matthew J. Del Mastro
Special Assistant United States Attorney
USAO No. 203
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail: matthew.del.mastro@usdoj.gov